# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00393-CR

**Merril Leroy Jessop, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF SCHLEICHER COUNTY, 51ST JUDICIAL DISTRICT NO. 995, HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Merril Leroy Jessop filed a pro se notice of appeal following his conviction for sexual assault of a child. He also filed pro se motions for a free record and appointed counsel for the appeal. A hearing on the motions was held at which appellant was represented by his trial counsel, who was retained for the trial and who has informed the Court that he is now representing appellant on a pro bono basis. The trial court found that appellant is not indigent and overruled the motions. After counsel advised the Court that appellant wished to challenge the trial court's finding that he is not indigent, we ordered the preparation of a partial record, including the reporter's record from the indigency hearing. Counsel for both parties have submitted briefs addressing the propriety of the trial court's ruling. We affirm the court's order overruling the motions for appointed counsel and a free record.

**STANDARD OF REVIEW**

A defendant is indigent for the purpose of appointing appellate counsel if he is "not financially able to employ counsel." Tex. Code Crim. Proc. Ann. art. 1.051(b) (West Supp. 2010). For the appellate record to be furnished without charge, a defendant must be unable to "pay or give security for the appellate record." Tex. R. App. P. 20.2. These are discrete inquiries, but the same factors apply to both. *McFatridge v. State*, 309 S.W.3d 1, 5-6 (Tex. Crim. App. 2010). A court may consider the defendant's income, source of income, assets, property owned, outstanding obligations, necessary expenses, the number and ages of dependents, spousal income available to the defendant, and the ability to post bail insofar as that ability reflects the defendant's financial circumstances as measured by the other factors. *Id*. at 6; *Whitehead v. State*, 130 S.W.3d 866, 878 (Tex. Crim. App. 2004). The ability of a defendant to borrow money is something that may be taken into account in considering how the defendant's assets and property relate to the ability to pay, but a defendant should not be required to borrow money that can never be repaid without depriving him of the necessities of life. *Whitehead*, 130 S.W.3d at 878. The expense involved in hiring counsel and paying for the appellate record is also a valid consideration. *Id*.

The indigency determination is made on a case-by-case basis as of the time the issue is raised and not as of some prior or future time. *Id*. at 874. A two-step process is used: (1) the defendant must make a prima facie showing of indigence, and (2) when the prima facie showing is made, the burden shifts to the State to show that the defendant is not in fact indigent. *Id*. In determining whether the defendant has made a prima facie showing of indigence, a trial court does not have the discretion to simply disbelieve the defendant's evidence of indigence. *Id*. at 875. A

2

trial court may disbelieve a defendant's allegation of indigence only if there is a reasonable, articulable basis for doing so, either because there is conflicting evidence or because the evidence submitted is in some manner suspect or inadequate. *Id*. at 876.

If a defendant made a prima facie showing of indigence, a trial court's determination that the defendant is not indigent may be upheld on appeal only if the record contains evidence supporting this determination. *McFatridge*, 309 S.W.3d at 6. A reviewing court may uphold a trial court's ruling denying indigent status only if it finds that the trial court, having utilized the two-step process, reasonably believed that the defendant was not indigent. *Id.*

**EVIDENCE**

Appellant is a member of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS). Appellant testified at the hearing that he moved to the YFZ (Yearning For Zion) Ranch in Schleicher County in 2004, and that he lived there until his conviction in this cause. In an affidavit that appears in the record, appellant states that he is married and that his wife continues to live at the YFZ Ranch. There is no evidence that appellant has children.

In his affidavit of indigence, appellant stated that he has no income. He listed no assets except for household furnishings valued at $500 and clothing valued at $200. In his testimony, appellant also acknowledged having title to a 2003 Yukon Suburban. Appellant testified that this vehicle was purchased with a loan from a Utah bank. Appellant did not testify to the value of the vehicle or the size of the loan, although he did state that the amount owed exceeded the vehicle's value. Appellant also testified that he had tools worth approximately $200 and approximately $100 in a savings account.

3

In his affidavit, appellant claimed a $650 per month expense for "auto payment/insurance." Appellant testified, however, that he made no insurance payments. The only other listed expense was a $200 per month credit card payment. Appellant testified that he and the other residents at the YFZ Ranch pay nothing for their housing or utilities. They also pay nothing for food, clothing, and other supplies, which are provided through the ranch storehouse.

Appellant testified that he managed the ranch dairy. He also testified that he worked for Texan Supply and Services delivering sand, gravel, and concrete to building sites. Texas Ranger Brooks Long testified that Texan Supply was one of several businesses based at the YFZ Ranch. The State introduced a document from the secretary of state showing that Texas Supply and Services is a limited liability company managed by a Richard Jessop. Comptroller's records also introduced by the State reflect that from January 2009 through March 2010, Texan Supply had total sales of $3,911,907. Appellant testified that the work he did for Texan Supply was for the benefit of the YFZ Ranch, but he said that he did not know what happened to the income the business generated.

Appellant testified that he received a "lunch allowance" from Texan Supply, but that he otherwise received no wage or salary for his work. Instead, he would "[o]ccasionally" receive what is referred to as a "personal needs distribution" from the bishop, Fredrick Merril Jessop.[1] During cross-examination by the prosecutor, appellant stated that he was unable to recall the size of these distributions and could not estimate the total amount he had received over the years, although he did confirm that the distributions had continued until the date of his conviction. Although pressed

---

[1] The record does not reflect if or how appellant is related to Richard Jessop and Fredrick Merril Jessop.

4

by the prosecutor, appellant would not or could not explain the purpose of these payments or how they came to be made, other than to say, "I could put a request for a need and one way or the other . . . we would be taken care of."[2] During redirect examination, appellant testified that the timing of

---

[2] The following excerpt reflects the nature of appellant's cross-examination on this topic:

> Q. And then if there were special things that you or your family needed, there would be something called a personal needs distribution, correct?
>
> A. Somewhat, yes.
>
> Q. And each and every month the bishop would take funds that were held at the ranch and would do personal needs disbursements to you and others living out at the ranch, correct?
>
> A. I don't know how he arranged it, but —
>
> Q. You got the money, though, right?
>
> A. I did not get money.
>
> Q. Mr. Jessop, would you receive from time to time an amount of money from the bishop out at the YFZ Ranch?
>
> A. What do you mean, by — for a personal need?
>
> Q. Yes, sir.
>
> A. Well, I could put a request for a need and one way or the other —
>
> Q. And doesn't —
>
> A. — we would be taken care of.
>
> Q. Right. And by taken care of, you would ask for a certain amount of money, and that amount of money would either be given to you or it wouldn't, right?
>
> A. I don't know that I quite understand exactly what — how you're trying to put it.

these distributions varied, and he said that they were usually for $50 to $200. He estimated that he had never received more than $3000 in a year.

FBI Special Agent Johnathan Broadway testified for the State. Broadway, a certified public accountant, stated that he had analyzed financial records seized at the YFZ Ranch in April 2008 pursuant to a federal search warrant. These records, some of which were introduced in evidence at the hearing, covered the years 2005, 2006, and 2007. Broadway testified that the records

Q. I'm — I'll try to make it as simple as I can. Every month you could go to the bishop and say: I need, for example, $400 to take care of some special needs for my family, correct?

A. I would say yes.

Q. And the way that request would be granted is you put in your request and you know the request is granted, because you get the money back, right?

A. Not always.

. . .

Q. And tell the Court how much you've received in terms of these personal needs requests from the bishop at the YFZ Ranch.

A. You want me to — say that again.

Q. Give us a rough estimate of how much money total have you received from the bishop based on these personal needs requests.

A. I could not give an accurate amount.

Q. Talking about thousands of dollars?

A. That's — I honestly can't give an accurate estimation.

showed that the YFZ Ranch operated on a communal basis, with the earnings of the various individuals and businesses pooled, and the living expenses of the community members paid from these pooled funds. With respect to vehicles, Broadway testified that "although they were titled in many of the individual's names, the actual note payments, car insurance payments, that type of thing, were actually paid for by the enterprise."

The documents studied by Broadway included the records of the bishop's personal needs payments to the residents of the YFZ Ranch. Broadway testified that during the years for which he had records, the bishop had made $1,151,881 in personal needs distributions, which were over and above the costs for housing, food, clothing, and other necessities paid for by the ranch. The records reflect that in 2005, appellant received six distributions totaling $18,700. Appellant received a personal needs distribution, usually $3500, during each month of 2006, for a total of $41,300. He received three distributions totaling $12,900 in 2007. There is no evidence as to what appellant did with this money.

Appellant testified that he was unable to borrow money. He acknowledged, however, borrowing somewhere between $3000 and $5000 from Texan Supply in 2009. There is no evidence as to how or whether this loan was repaid, although it was not listed as a liability in appellant's affidavit of indigency.

Appellant testified that he did not know how his trial attorneys had been paid. He said that he had discussed the matter with the bishop, and that the bishop had told him, "We're working on it." Appellant testified, in response to a question from the court, that he had not asked the bishop to provide funds for this appeal. We note, however, that at the conclusion of testimony,

defense counsel told the court, "I believe that I have made that request and I believe that the answer is no." There is no evidence as to the cost of the appeal, either for attorney's fees or for the record.

## DISCUSSION

Considered alone, appellant's direct testimony tended to establish a prima facie showing of indigence. He testified that he had no income, no assets of any significance, and no ability to borrow money. But when the record as a whole is considered, we conclude that the trial court could reasonably believe that appellant's claim of indigence was not credible.

The financial records introduced in evidence show that appellant received $72,900 in personal needs distributions during the years 2005, 2006, and 2007. Although the question before the court was whether appellant was indigent at the time of the 2010 hearing, we believe that this evidence was relevant to that question for at least three reasons. First, the documentary evidence contradicts appellant's testimony that the personal needs distributions were generally for $50 to $200, and that he had never received more than $3000 in a single year. The magnitude of the discrepancy calls into question appellant's credibility generally. Second, appellant testified that he continued to receive personal needs distributions until the date of his conviction. Although the State did not have copies of the YFZ Ranch's more recent financial records, the court could reasonably infer that the distributions appellant received in 2008, 2009, and 2010 were similar in amount to those distributions appellant previously received. Third, the evidence shows that appellant did not use the personal needs distributions to feed, house, or clothe himself and his wife. These expenses, as well as appellant's vehicle expenses, were separately paid by the YFZ Ranch. Given that all the necessities of daily life were provided by the ranch, and given appellant's reluctance to explain the

8

amount or purpose of the personal needs distributions, the trial court could reasonably doubt the credibility of appellant's claim that he had not saved any of the tens of thousands of dollars he had received in the form of the personal needs distributions.

The court had further reason to doubt the credibility of appellant's affidavit of indigence. In the attachment to his affidavit, appellant claimed to be paying $650 each month on a vehicle loan and insurance. But appellant testified that he did not make insurance payments, and there is other credible evidence that appellant did not personally make the loan payments.

Appellant's testimony that he was unable to borrow money was also contradicted. Appellant himself testified that he had borrowed as much as $5000 from Texan Supply during the year preceding the hearing. Appellant did not disclose the use to which this money was put, but it clearly was not used to pay appellant's trial counsel. That expense, too, had been paid by the YFZ Ranch or by the bishop, according to appellant's testimony.

Finally, appellant offered no evidence as to the cost of the appellate record and whether the record would have to be paid for in advance. Absent even an estimate of the cost of the record, it is difficult for appellant to argue that he is unable to pay for it.

For the reasons stated, we conclude that the trial court had reasonable and articulable bases for disbelieving appellant's claim of indigence and for determining that appellant did not make a prima facie showing of present indigence. We emphasize that our conclusion is not based on any consideration of the financial resources of the YFZ Ranch as an entity, or on a belief that appellant can or should be expected to call upon those resources to pay the costs of this appeal. We have considered appellant's relationship with the YFZ Ranch and its related enterprises only insofar as

9

that relationship is relevant to an assessment of appellant's testimony regarding his personal income, expenses, and assets.

The trial court's order overruling appellant's motions for a free record and appointed counsel is affirmed. Subject to extension for good cause shown, appellant has thirty days from the date of this opinion to pay or make satisfactory arrangements to pay the clerk's and reporter's fees in this cause. *See* Tex. R. App. P. 37.3(b), (c).

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: January 19, 2011

Do Not Publish